# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALEXANDRA KOBRICK, | : | CIVIL ACTION NO. 3:13-CV-2865 |
| | : | |
| Plaintiff | : | (Chief Judge Conner) |
| | : | |
| v. | : | |
| | : | |
| MATTHEW STEVENS, LAKELAND | : | |
| SCHOOL DISTRICT, WESTERN | : | |
| WAYNE SCHOOL DISTRICT, DR. | : | |
| MARGARET BILLINGS-JONES, | : | |
| THOMAS KAMEROSKI, ANDREW | : | |
| FALONK, and PATRICK SHEEHAN, | : | |
| | : | |
| Defendants | : | |

## <u>MEMORANDUM</u>

Plaintiff Alexandra Kobrick commenced this action advancing several constitutional, statutory, and common law claims against her former teacher, two school districts, and various administrators. (Doc. 1). Before the court are three motions (Docs. 102, 105, 107) for summary judgment filed by the school districts and administrators pursuant to Federal Rule of Civil Procedure 56. For the reasons that follow, we will grant the pending motions.

# I.  Factual Background & Procedural History[1]

This action arises from an approximately eight-month-long sexual relationship between plaintiff Alexandra Kobrick ("Kobrick") and defendant Matthew Stevens ("Stevens"), her former music teacher and band director, which began during her senior year in high school.  (See Doc. 1).

Stevens was hired as the assistant marching band director by defendant Western Wayne School District ("Western Wayne") in June of 2009.  (Doc. 103 ¶ 2; Doc. 108 ¶ 22).[2]  Stevens' direct supervisor at Western Wayne was Ray Stedenfeld ("Stedenfeld"), director of the band.  (See Doc. 140 ¶¶ 17-86).  Stevens was hired at Western Wayne for the fall 2009 marching band season.  (Doc. 103 ¶ 2; Doc. 129 ¶ 2).

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 103, 106, 108, 129, 131, 140).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the statements of material facts.  We note as a preliminary matter that Kobrick largely fails to comply with the requirements of Rule 56.1.  She responds to many defense statements with the phrase "denied as stated" without citing to contradictory record evidence.  The vast majority of Kobrick's denials represent disagreement as to proper inferences to be drawn from a fact—not a denial of the fact itself.  The court has independently examined the entire Rule 56 record.  Citation to any statement of fact reflects the court's determination that the fact is supported by uncontroverted record evidence.

[2] Kobrick denies "as stated" paragraphs 17 through 86 of the Western Wayne defendants' statement of facts (Doc. 108) and proceeds to supply her own nine-page description of the genesis of her claims.  (See Doc. 140 ¶¶ 17-86).  Kobrick does not specifically deny the substance of these paragraphs, nor does she cite to evidence contradicting defendants' statements.  (See id.)  The court's review of the record reveals that each "denied" paragraph is fully supported by the record evidence.

According to Stevens' resume, his employment with Western Wayne ended in December of 2009. (Doc. 103 ¶ 2; Doc. 129 ¶ 2). Stevens' resume includes prior employment as a student teacher at two schools, Western Wayne and Lakeside Elementary School, as well as an interim high school music teacher position at Blue Ridge School District from November of 2009 to February of 2010. (Doc. 103 ¶ 2; Doc. 129 ¶ 2).

On November 18, 2009, Joseph Totsky ("Totsky"), a guidance counselor at Western Wayne, received an anonymous call from someone claiming to have "some news the school should be made aware of." (Doc. 108 ¶¶ 81, 84). The caller, later identified as a parent of a Western Wayne student, expressed concern about what she believed to be an "inappropriate relationship" between another student, C.N.,[3] and Stevens during the 2009 band season. (Id. ¶¶ 45, 84-85). Totsky met with the parent in his office that day. (See Totsky Dep., 21:22-22:24, 33:9-34:6, Aug. 12, 2015).[4] The parent explained that she had noticed text messages on her daughter's phone which suggested that C.N. (a friend of her daughter) was involved in a sexual relationship with Stevens. (Id. at 26:10-27:22). Totsky immediately reported what he learned to defendant Patrick Sheehan ("Sheehan"), principal at Western Wayne at the time. (Doc. 108 ¶¶ 32, 35, 37, 44). Sheehan in turn reported the information to

---

[3] C.N. is no longer a minor. However, because C.N. is not a party to this lawsuit, the court uses her initials throughout this memorandum to protect her privacy.

[4] Partial transcripts of Totsky's deposition are filed by the parties at numerous, separate docket entries. Unless otherwise noted, the court will cite to this deposition *passim* as "Totsky Dep." without docket entry citations. The court employs this citation convention for all deposition transcripts identified herein.

defendant Andrew Falonk ("Falonk"), then-superintendent of Western Wayne. (See id. ¶¶ 21, 24-25).

Falonk testified that, when he first received word of the anonymous call, he believed the report to likely be a "rumor." (See Falonk Dep. 65:1-6, Apr. 2, 2015). Nonetheless, because the report was "at this level," Falonk thought it was "worth . . . looking into it so that we could answer any questions if, in fact, someone asked or came forward." (Id. at 68:14-24). Falonk tasked Sheehan to escort C.N. to the nurse's office or the guidance office to ask whether the rumor was true. (Doc. 108 ¶¶ 26-27). Falonk also ordered Sheehan to speak with C.N.'s parents. (Id. ¶ 29).

Both C.N. and her parents denied the rumor. (Id. ¶¶ 28, 30, 34). A female guidance counselor, Joanne Tagle ("Tagle"), interviewed C.N. (See id. ¶¶ 62-63, 65-66). C.N. reported to Tagle that she "felt comfortable" around Stevens. (Id. ¶ 72). Tagle queried whether C.N. was in a "sexual relationship" with Stevens. (Id. ¶ 73). C.N. answered, "No." (Id. ¶¶ 20, 73). Tagle also asked whether the pair had *any* inappropriate contact, including hugging or kissing. (Id. ¶¶ 74-75). C.N. denied any physical contact. (Id. ¶¶ 74-75). During later criminal proceedings related to this litigation, C.N. admitted that she had "denied everything" when interviewed by Tagle. (Id. ¶ 20).

Tagle also called C.N.'s father, whom she knew through his employment with Children and Youth Services. (See id. ¶ 78; Tagle Dep. 59:4-8, Aug. 12, 2015). C.N.'s father denied the rumor. (See Doc. 108 ¶¶ 54-55; see also id. ¶¶ 29-30, 34, 51). Western Wayne concluded that accusation was "unfounded" and believed "there was no further investigating necessary" based on the responses of C.N. and her

father.  (Id. ¶¶ 53-54).  It is not entirely clear from the record whether Stevens was still employed at Western Wayne at the time of this investigation or whether his term as assistant band director had expired.  It is undisputed that Falonk and Sheehan never spoke to Stevens regarding the "rumor."  (Id. ¶ 23; Sheehan Dep. 66:3-11, Mar. 30, 2015).

Defendant Lakeland School District ("Lakeland") received Stevens' standard application for teaching in Pennsylvania public schools on June 29, 2010.  (Doc. 103 ¶ 2; Doc. 129 ¶ 2).  Stevens' resume identified his educational background, his prior experience at Western Wayne and Blue Ridge, and four references.  (Doc. 103 ¶ 2; Doc. 129 ¶ 2).  The application contained three favorable recommendation letters, including one authored by Stedenfeld in his capacity as Stevens' direct supervisor at Western Wayne.  (Doc. 103 ¶ 2; Doc. 129 ¶ 2; see Doc. 106 ¶ 215).  The application also contained a mandatory background check and child abuse history clearance, both reflecting no history of child abuse.  (Doc. 103-3 at 104-05; see Doc. 103 ¶ 3; Doc. 129 ¶ 3).  A member of the Lakeland school board highly recommended Stevens for the job.  (Doc. 103 ¶ 5; Doc. 129 ¶ 5).  Lakeland did not separately contact Western Wayne for additional information.  (Sheehan Dep. 181:22-25).  Sheehan testified that, had someone from Lakeland contacted him about Stevens' application, he likely would have disclosed the 2009 rumor.  (See id. at 181:4-182:25).

Stevens participated in two interviews, the first with defendant Margaret Billings-Jones ("Billings-Jones"), then-superintendent of Lakeland, and the second with Billings-Jones and the school board.  (Doc. 103 ¶ 4; Doc. 129 ¶ 4).  On July 21, 2010, Lakeland hired Stevens as a secondary music teacher for the 2010-2011 school

year.  (Doc. 103 ¶ 6; Doc. 129 ¶ 6).  Stevens was appointed to the additional post of assistant band director in October of 2010.  (See Doc. 103 ¶ 6; Doc. 129 ¶ 6).  During his first year at Lakeland, Stevens participated in new teacher induction training conducted by a local intermediate unit.  (See Doc. 103 ¶ 8; Doc. 106 ¶ 265; Doc. 129 ¶ 8).  This training is mandated under state law and includes instruction on the Code of Professional Practice and Conduct for Educators.  (See Doc. 106 ¶ 263).[5] The training program covers, *inter alia*, appropriate professional conduct and "teacher-student sexual conduct."  (Id.)

Kobrick first met Stevens at band camp in the summer preceding the 2010-2011 school year, which was her junior year at Lakeland.  (See Kobrick Dep. 170:12-171:3, Apr. 1, 2015).  Kobrick described her relationship with Stevens during her junior year as a "normal" teacher-student relationship.  (Id. at 364:3-5).  Kobrick spent much time in the band room both during and after school throughout her junior year due to her music-focused curriculum.  (See Doc. 103 ¶ 10; Doc. 129 ¶ 10). During the 2010-2011 school year, in advance of a school trip, Stevens exchanged cell phone numbers with all band members for use in the event of an emergency. (Kobrick Dep. 211:18-213:8).

Kobrick intended to pursue a career in music education after graduation, and her curriculum and extracurricular activities were focused toward that goal.  (See id. at 68:8-69:9, 90:23-91:4).  Kobrick auditioned and was selected for the position of

---

[5] Kobrick does not respond to this paragraph of Billings-Jones' statement of facts.  (See Doc. 131).  Although Kobrick contends throughout her papers that the teacher induction training is inadequate, she does not deny that it occurred.  (See, e.g., Doc. 129 ¶ 8).

drum major at the end of her junior year. (Id. at 24:18-26:13; see also Doc. 103 ¶ 11; Doc. 106 ¶ 38; Doc. 129 ¶ 11). Kobrick's senior year class schedule included music appreciation, jazz band, and instrumental music courses, in addition to her drum major responsibilities. (Doc. 103 ¶ 15; Doc. 129 ¶ 15; see Doc. 106 ¶ 40). Kobrick's schedule resulted in her having more contact with Stevens than other members of the band. (Doc. 103 ¶¶ 13-14; Doc. 129 ¶¶ 13-14). At some point during Kobrick's senior year, Stevens arranged with a study hall teacher, Derrick Shayka ("Shayka"), for Kobrick to spend her study hall period in the band room. (Kobrick Dep. 194:8-195:19, 198:20-200:5). Neither school staff nor Kobrick's parents were concerned that she spent so much of her time in the band room with Stevens given her music-oriented studies. (See Doc. 103 ¶¶ 18-19, 23, 27, 31, 34-36, 41-42, 64-65, 71, 95; Doc. 106 ¶¶ 37-41, 45, 95, 126, 146, 166, 192-93).

Stevens began texting Kobrick about topics "outside of school," including their personal lives, sometime in the fall of 2011. (Doc. 108 ¶¶ 7-8; Doc. 140 ¶¶ 7-8; Kobrick Dep. 213:13-24). On December 31, 2011, Kobrick texted Stevens and joked that she wished she had someone to share a New Years' Eve kiss with, and Stevens replied that he would kiss Kobrick. (Kobrick Dep. 217:14-218:23). Kobrick was 17 years' old at the time. (See Doc. 101 ¶ 1; Doc. 138 ¶ 1). Stevens was 29. (See Doc. 101 ¶ 9; Doc. 138 ¶ 9).

The relationship between Stevens and Kobrick became physical in January of 2012, when Stevens kissed Kobrick on the lips while she was helping him to sort records in the band room. (See Doc. 106 ¶¶ 99-100; Doc. 131 ¶¶ 99-100; Kobrick Dep. 222:15-224:21). Kobrick was "shocked" by the kiss but did not leave the room. (See

Kobrick Dep. 224:22-225:14). Stevens touched Kobrick in "private areas over [her] clothes" during a second incident later that afternoon, and a second kiss and more sexual touching occurred the next day. (Id. at 230:23-236:17, 240:5-17, 243:20-249:1; see also Doc. 106 ¶ 104; Doc. 108 ¶¶ 10-11; Doc. 140 ¶¶ 10-11). Kobrick did not report these incidents to her friends, parents, or Lakeland administrators. (Kobrick Dep. 227:18-228:1, 249:14-19, 269:23-274:14). Kobrick explained that she did not think her mother—a colleague of Stevens at the high school—would believe her because Stevens "was a teacher . . . in a place of authority." (Id. at 228:11-229:14, 237:3-12). Kobrick testified that, although she was initially shocked at Stevens' conduct, she enjoyed his attention. (Id. at 269:23-272:8).

The sexual contact between Stevens and Kobrick began occurring regularly and escalated to include other sexual acts, including oral sex. (Id. at 251:24-253:13, 267:21-268:20). Relations took place in the band room—including in Stevens' office, a practice room, and a drum closet—both during and after school. (Id. at 253:14-254:16, 255:25-256:3; see also Doc. 106 ¶¶ 106-07). On several occasions, the acts transpired with other students in the band room: the pair would hide in a drum closet and close the door to avoid discovery. (Kobrick Dep. 255:4-257:8). Sexual contact even occurred on an overnight school trip, when Kobrick snuck out of a room she was sharing with her mother to visit Stevens. (Doc. 106 ¶¶ 116-17; Doc. 131 ¶¶ 116-17). Kobrick testified that the only person who may have known of the relationship was defendant Thomas Kameroski ("Kameroski"), then-principal at Lakeland, who "walked in one time" when Kobrick had her "arms wrapped around [Stevens'] waist." (Kobrick Dep. 259:18-262:2). As soon as Kameroski entered the

room, Kobrick "immediately" dropped her arms. (Id. at 264:1-23). Kobrick believes Kameroski witnessed the embrace. (Id. at 263:17-25, 264:24-265:5).[6] Kameroski denies that this incident occurred. (Doc. 103 ¶¶ 57, 85).

Kobrick estimated that she and Stevens had sexual contact two or three times weekly through the end of the school year. (Kobrick Dep. 258:2-259:1, 269:20-22). Kobrick graduated from Lakeland on June 1, 2012 and turned 18 one month later. (See Kobrick Dep. 285:9-12, 293:7-17). According to Kobrick, at the time she graduated, "nobody knew what was going on between [Kobrick] and Mr. Stevens other than [Kobrick] and Mr. Stevens." (Id. at 274:7-14). Kobrick did not disclose the relationship to her friends or family or to any staff while at Lakeland. (Id. at 294:24-296:7). During the course of the relationship and until she left for college, Kobrick thought of Stevens as a "boyfriend." (Id. at 297:1-16, 394:20-5). At the time, she believed their relationship was consensual. (Id. at 268:21-269:16, 271:25-272:15).

The relationship continued during the summer after Kobrick's graduation. (Id. at 285:9-17). When Kobrick left for college in mid-August, the physical aspect of the relationship ended, but Kobrick and Stevens exchanged text messages and talked on the phone while she was away. (Id. at 292:14-24, 301:24-302:16, 303:25-304:22). Their relationship devolved when, in September of 2012, Stevens called Kobrick and became pushy asking her to touch herself while on the phone with him. (Id. at 304:23-308:7). Kobrick refused and decided to cease all contact with

---

[6] Lakeland and Kameroski remonstrate cursorily that this testimony is both "incompetent" and "inadmissible" but articulate no basis for this claim. (See Doc. 104 at 24-25). We assume admissibility for purposes of this motion.

Stevens. (Id. at 311:13-20). Stevens texted Kobrick a handful of times thereafter, but Kobrick made excuses to avoid talking to him. (Id. at 312:7-313:18).

When Kobrick returned to Lakeland for a classroom observation in January of 2013, she saw Stevens in the band room behaving flirtatiously with two younger students. (See id. at 323:20-326:2, 330:10-334:5; see also Doc. 103 ¶ 50; Doc. 129 ¶ 50). Kobrick warned Stevens to "watch himself and watch how he was acting with those girls because he's going to get caught." (Kobrick Dep. at 334:6-13). She testified that this conversation was her last with Stevens. (See id. at 335:1-3).

Kobrick called her mother on February 14, 2013 and disclosed that she had sexual relations with Stevens during her senior year. (Doc. 103 ¶¶ 52-53; Doc. 106 ¶¶ 51, 53). Kobrick's mother contacted the Pennsylvania State Education Association ("PSEA") for guidance. (Doc. 106 ¶ 54). A PSEA representative advised that the incident should be reported to Billings-Jones. (Id. ¶ 55). Kobrick's mother met with Billings-Jones that afternoon and relayed Kobrick's report. (Doc. 103 ¶ 55; Doc. 106 ¶¶ 57, 59). Billings-Jones immediately notified the district attorney and thereafter contacted Kameroski, the district's counsel, and its solicitor. (See Doc. 103 ¶¶ 55-56; Doc. 106 ¶¶ 59-60, 72-74). Billings-Jones directed Kameroski to ensure that Stevens was not alone with students and to escort him from school property. (See Doc. 103 ¶¶ 56-57; Doc. 106 ¶¶ 69-70). Billings-Jones also contacted the Department of Education to report Kobrick's allegations. (Doc. 106 ¶ 83).

On February 15, 2013, Kobrick provided a written statement to the district attorney's office detailing the sexual contact with Stevens. (Kobrick Dep. 345:6-10). Stevens was charged with institutional sexual assault, unlawful contact with minor,

and corruption of minors and was arrested on February 19, 2013.  Commonwealth

v. Stevens, No. CP-35-CR-563-2013 (Pa. Ct. Com. Pl. 2013)[7]; (see also Doc. 103 ¶ 58;

Doc. 106 ¶ 85).  Lakeland terminated Stevens' employment following his arrest.

(Doc. 103 ¶ 60; Doc. 106 ¶ 86).  On June 16, 2014, Stevens entered a plea of guilty to

one count of corruption of minors.  Commonwealth v. Stevens, No. CP-35-CR-563-

1023 (Pa. Ct. Com. Pl. June 16, 2014); (Doc. 101 ¶ 111).  The state court sentenced

Stevens to a term of 6 to 23 months' imprisonment.  Commonwealth v. Stevens,

No. CP-35-CR-563-2013 (Pa. Ct. Com. Pl. Oct. 1, 2014).  Prior to this incident, no

administrator or staff member at Lakeland had ever received any reports of or

otherwise suspected sexual misconduct by Stevens.  (See Doc. 103 ¶¶ 20, 25, 30, 32,

39-40, 45, 103; Doc. 106 ¶¶ 108-13, 122-24, 133-35, 137, 139, 145, 153, 155, 157, 159, 161,

164, 167, 170-75, 179-81, 184-89, 194, 196).

At her mother's recommendation, Kobrick commenced counseling on the

day she reported Stevens' conduct to authorities.  (Kobrick Dep. 341:16-21, 342:1-

19).  Kobrick began suffering from anxiety after reporting the relationship and is

prescribed Zoloft to manage her symptoms.  (See id. at 362:5-363:1).  Kobrick also

suffers from nightmares and crying spells, and "get[s] sick to [her] stomach" talking

about what happened.  (Id. at 378:12-379:10).  Kobrick testified that, over the course

of two years preceding her deposition, she treated with a counselor while at school,

a social worker while at home, and her primary care physician concerning her

anxiety and stress.  (Id. at 353:6-362:4).  Kobrick also testified that she has been

---

[7] We take judicial notice of the public docket of proceedings in the Court of
Common Pleas of Lackawanna County.  See FED. R. EVID. 201(b)(2).

unable to work in a classroom and had to change her music education major.  (See id. at 90:2-91:18).

Kobrick commenced this action with the filing of a 14-count complaint (Doc. 1) on November 25, 2013.  Kobrick generally catalogues the defendants into three groups: the Western Wayne defendants (Western Wayne School District, Falonk, and Sheehan); the Lakeland defendants (Lakeland School District, Billings-Jones, and Kameroski); and Stevens, individually.  After Rule 12(b)(6) motion practice, the following claims remain against the Western Wayne and Lakeland defendants:

- Count 4: a claim against the Lakeland School District, Billings-Jones, and Kameroski pursuant to 42 U.S.C. § 1983 for violation of substantive due process under the Fourteenth Amendment;

- Count 5, a claim against Lakeland School District for discrimination in violation of Title IX of the Education Amendments Act ("Title IX"), 20 U.S.C. § 1681(a);

- Count 6: a claim against Western Wayne School District, Falonk, and Sheehan pursuant to 42 U.S.C. § 1983 for violation of substantive due process under the Fourteenth Amendment;

- Count 7: a claim against Lakeland School District for discrimination in violation of Title IX, 20 U.S.C. § 1681(a); and

- Count 14: a claim against Kameroski and Sheehan for intentional infliction of emotional distress under Pennsylvania law.

See Kobrick v. Stevens, No. 3:13-CV-2865, 2014 WL 4914186, at *9-19 (M.D. Pa. Sept. 30, 2014) (Mannion, J.).[8]

---

[8] Judge Malachy E. Mannion presided over this case throughout the pleading stage and during discovery.  Judge Mannion entered a recusal order on July 10, 2017, and the matter was reassigned to the undersigned.  (Doc. 142).

All defendants moved for summary judgment on July 15, 2016. (Docs. 100, 102, 105, 107). The motions are fully briefed and ripe for disposition. In view of the distinct theories of liability attending Kobrick's claims against Stevens, the court addresses Stevens' motion (Doc. 101) by separate memorandum of today's date. We analyze the school district and administrator defendants' Rule 56 motions herein.

## II. <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forth with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986). Only if this threshold is met may the cause of action proceed. <u>See</u> <u>Pappas</u>, 331 F. Supp. 2d at 315.

## III. <u>Discussion</u>

Kobrick's claims against the Western Wayne and Lakeland defendants are threefold: *first*, that the defendants, individually and at the institutional level, failed to protect Kobrick's bodily integrity and thereby violated her Fourteenth Amendment right to substantive due process; *second*, that the defendant school districts were deliberately indifferent to known sexual harassment in violation of

Title IX; and *third*, that defendants Kameroski and Sheehan intentionally inflicted emotional distress upon Kobrick.  The court addresses each claim *seriatim*.

### A.     Section 1983 Claims

Section 1983 of Title 42 of the United States Code creates a private cause of action to redress constitutional wrongs committed by state officials.  See 42 U.S.C. § 1983.  The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law.  Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996).  To state a claim under Section 1983, plaintiffs must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law."  Kneipp, 95 F.3d at 1204 (quoting Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995)).  The defendants do not dispute that they were state actors at all times relevant herein.  We must thus determine whether any defendants' conduct deprived Kobrick of rights secured by the United States Constitution.

The Due Process Clause of the Fourteenth Amendment provides that no state may "deprive any person of life, liberty, or property, without due process of law."  U.S. CONST. amend XIV, § 1.  The Supreme Court of the United States interprets this clause to transcend "fair process" and proscribe certain substantive government actions without regard to the fairness of procedures implementing them.  Washington v. Glucksberg, 521 U.S. 702, 719 (1997); Daniels v. Williams, 474 U.S. 327, 331 (1986).  To prevail on a substantive due process claim, a plaintiff must prove that she has a "fundamental" liberty interest implicating Fourteenth

Amendment protection and that a defendant's conduct anent said interest was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8 (1998).[9]

Among the fundamental liberty interests protected by substantive due process is the "right to bodily integrity." Albright v. Oliver, 510 U.S. 255, 272 (1994) (citing Planned Parenthood of Se. Pa. v. Casey, 505 U.S. 833, 847-49 (1992)); Phillips v. Cty. of Allegheny, 515 F.3d 224, 235 (3d Cir. 2008) (citations omitted). This right includes the right to be free from "invasion of . . . personal security through sexual abuse." Stoneking v. Bradford Area Sch. Dist., 882 F.2d 720, 726 (3d Cir. 1989), cert. denied, 493 U.S. 1044 (1990). In the public school context, the Third Circuit Court of Appeals has expressly held that the Due Process Clause encompasses and defends a student's right "to be free from sexual abuse by school staff." Id. at 726-27.

By separate memorandum of today's date, we determined that Kobrick's claim against Stevens for violation of her right to bodily integrity survives Rule 56 scrutiny. The instant motions task the court to determine whether either school district or any administrator may be held to account for Stevens' conduct.

---

[9] Kobrick's complaint purports to assert a due process claim under the Fifth Amendment. (See Doc. 1 ¶¶ 87, 111). In responding to the instant Rule 56 motions, Kobrick appropriately concedes that the Fifth Amendment's due process guarantee applies only to the federal government. (See Doc. 130 at 30); see also B&G Constr. Co. v. Director, Office of Workers' Compensation Programs, 662 F.3d 233, 246 n.14 (3d Cir. 2011).

1.   **Monell** *Claims Against Western Wayne and Lakeland School Districts*

Municipalities and other local government entities are "persons" for purposes of Section 1983 liability. Monell v. N.Y.C. Dep't of Social Servs., 436 U.S. 658, 690 (1978). But such entities may not be held liable in a Section 1983 suit for conduct of their employees under a theory of *respondeat superior* liability. Bd. of Cty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997) (citing Monell, 436 U.S. at 692); see also Colburn v. Upper Darby Twp., 946 F.2d 1017, 1027 (3d Cir. 1991). Municipal liability only arises when a government causes an employee to violate another's constitutional rights by an official custom or policy. Monell, 436 U.S. at 690-94; see also Montgomery v. De Simone, 159 F.3d 120, 126 (3d Cir. 1998). To establish liability under Monell, a plaintiff must identify the challenged policy or custom, demonstrate proper attribution to the public entity, and show a causal link between the execution of the policy or custom and the injury suffered. See Natale v. Camden Cty. Corr. Facility, 318 F.3d 575, 583-84 (3d Cir. 2003).

A policy exists when a decisionmaker possessing final authority to establish public policy with respect to the disputed action issues an official proclamation, policy, or edict. Id. at 584 (quoting Kneipp, 95 F.3d at 1212). By contrast, a custom is an act that is not formally approved but is nonetheless "so widespread as to have the force of law." Id. (quoting Bryan Cty., 520 U.S. at 404). A plaintiff may also establish municipal liability by demonstrating that a policymaker failed to take affirmative action despite an obvious need to correct the "inadequacy of existing practice [which is] so likely to result in the violation of constitutional rights" that

inaction exhibits "deliberate indifference" to the need. Id. (quoting Bryan Cty., 520 U.S. at 417-18). Kobrick's claims against the Western Wayne and Lakeland defendants implicate the third scenario.[10]

A government entity exhibits deliberate indifference when it "disregard[s] a known or obvious consequence of [its] . . . action." Connick v. Thompson, 563 U.S. 51, 61 (2011); see Vargas v. City of Phila., 783 F.3d 962, 974 (3d Cir. 2015). Failure to train amounts to deliberate indifference when it causes a pattern of cognate constitutional violations. See Connick, 563 U.S. at 62; Kelly v. Borough of Carlisle, 622 F.3d 248, 265 (3d Cir. 2010). Alleged training deficiencies must closely relate to the constitutional injury. City of Canton v. Harris, 489 U.S. 378, 391 (1989). The failure-to-act theory of liability is governed by the same causation principles. See Berg v. Cty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000).

### a.      Student Sexual Abuse

The Third Circuit set the standard for school district liability in cases of teacher sexual misconduct in Stoneking v. Bradford Area School District, 882 F.2d 720 (3d Cir. 1989). In Stoneking, a student alleged that the school district's principal and assistant principal were regularly and recklessly indifferent to reports of sexual abuse by teachers. See id. at 724-25. Administrators took no action in response to reports of sexual abuse made by students, parents, and teachers alike; what is more, some students were criticized for reporting and at least one was forced to publicly

---

[10] Kobrick's briefing does not articulate her theories of liability against the school districts or the administrators with precision. (See Doc. 130 at 7-23; Doc. 132 at 5-20; Doc. 141 at 10-28). Consequently, the distillation which follows reflects the court's best effort at interpreting Kobrick's less-than-pellucid submissions.

apologize to her abuser.  See id. at 727-29.  The principal also concealed the abuse by maintaining records of the allegations in a "secret file" at his home rather than disciplining the abusers, reporting them to authorities, or otherwise handling the allegations appropriately.  Id. at 728-29.  The Third Circuit agreed with the plaintiff that the administrators' inaction "at a minimum" facilitated a pattern of abuse.  Id. at 725, 727.  The court also agreed that the ostensible condonation of the teachers' actions evinced an "affirmative link" between the administrators' practices and repeated assaults suffered by the plaintiff.  Id. at 730-31.  The court concluded that although "inaction and insensitivity" cannot justify municipal liability, "toleration, condonation[,] or encouragement" of sexual misconduct well may.  Id.

In nearly 30 years since Stoneking was issued, courts have had all-too-frequent opportunity to apply its guidance to cases involving sexual misconduct by teachers.  From Stoneking and its progeny, the following principles have emerged. *First*, actual knowledge is paramount to Section 1983 liability; a district's failure to act, or to train its employees to act, can only constitute deliberate indifference if the plaintiff proves that policymakers were on notice of a need to do so.  See, e.g., Kline ex rel. Arndt v. Mansfield, 255 F. App'x 624, 629-30 (3d Cir. 2007)[11]; M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist., 43 F. Supp. 3d 412, 421-22 (M.D. Pa. 2014); Douglas v. Brookville Area Sch. Dist., 836 F. Supp. 2d 329, 364 (W.D. Pa. 2011). *Second*,

---

[11] The court acknowledges that Kline is a nonprecedential decision. Nonetheless, the court has considered the panel's *ratio decidendi* and is persuaded by the same.  Kline was decided on substantially similar facts to those *sub judice*, and its analysis and result rest on a careful application of binding decisional law, including Stoneking and Black by Black v. Indiana Area Sch. Dist., 985 F.2d 707 (3d Cir. 1993).

courts cannot infer knowledge based on unsubstantiated rumors or suspicion; a plaintiff must prove something "more culpable" than failure to recognize a *risk* of harm, Black, 985 F.2d at 712-13 (quoting Colburn, 946 F.2d at 1025), and show that the school's policymakers were "aware of the constitutionally violative sexual relationship while the relationship was ongoing." M.S., 43 F. Supp. 3d at 421-22 (citing Johnson v. Elk Lake Sch. Dist., 283 F.3d 138, 144 (3d Cir. 2002)). *Third*, once such knowledge is shown, inaction or recalcitrance by school officials is sufficient to establish deliberate indifference. Stoneking, 882 F.2d at 725; see, e.g., Doe v. Boyertown Area Sch. Dist., 10 F. Supp. 3d 637, 650-51 (E.D. Pa. 2014); C.M. v. Se. Delco Sch. Dist., 828 F. Supp. 1179, 1184-85 (E.D. Pa. 1993).

Against this backdrop, we examine Kobrick's claims against the Western Wayne and Lakeland School Districts.

### b. Western Wayne School District

Kobrick asserts a failure-to-act claim against the Western Wayne School District. Specifically, she contends that the district failed to appropriately respond upon learning that Stevens posed a threat to present and future students. (Doc. 141 at 10-24). Her claim is predicated on Stevens' alleged sexual relationship with a student, C.N., during the fall of 2009 when Stevens was assistant marching band director at Western Wayne. (Id.) The school district rejoins that its response to the rumored relationship was entirely appropriate and that Kobrick fails to establish either knowledge or deliberate indifference. (See Doc. 113 at 8-10).

We agree that the *probata* does not establish actual, contemporaneous knowledge of abuse on the part of Western Wayne. In the context of failure to share

information with prospective employers—the very charge levied against Western Wayne—<u>Doe v. Methacton School District</u>, 880 F. Supp. 380 (E.D. Pa. 1995), is particularly instructive. In <u>Doe</u>, a music teacher began a physical "relationship" with his 12-year-old student. <u>Id.</u> at 382. Administrators learned of this conduct and warned the teacher to end it. <u>Id.</u> The relationship continued, and administrators met with the teacher, who admitted physical contact with the minor, to discuss how to proceed. <u>Id.</u> at 382-83. The district allowed the teacher to resign "to avoid an investigation and suspension," directing him to sign a prepared letter that cited "personal reasons" for his departure. <u>Id.</u> at 383. When a different school district later sought a reference for the teacher, administrators described his performance as "satisfactory" and concealed the abuse. <u>Id.</u> The teacher sexually abused a nine-year-old student after he was hired by the new school district. <u>Id.</u> at 382-83. The district court held that these facts evinced an "affirmative cover-up" and exhibited the district's deliberate indifference to the welfare of future students' constitutional rights. <u>Id.</u> at 384.

The uncontradicted evidence *sub judice* is in stark contrast. That evidence reflects that, in November of 2009, a guidance counselor at Western Wayne received an anonymous tip that an "inappropriate relationship" *may* have occurred between Stevens and a female student during marching band season. (Doc. 108 ¶¶ 84-85). Pursuant to district policy, the counselor reported the information to the principal, who in turn relayed it to the superintendent. (<u>Id.</u> ¶¶ 24-25, 32, 40, 43-47, 86; <u>see</u> Doc. 108-5). Despite construing the matter initially as a mere rumor, the superintendent immediately began an investigation, directing a female guidance counselor to

interview both the student in question and her parents.  (See Doc. 108 ¶¶ 26-27, 29,

35, 46, 48, 50, 65-66).  The counselor reported back that both the student and her

father denied the rumor.  (See id. ¶¶ 28, 34, 68-70, 72-78).  In a statement to law

enforcement issued years later, the student confirmed that she had denied any

wrongdoing by Stevens.  (Id. ¶ 20).  Because the student and her father both

denied the unsubstantiated rumor, Western Wayne did not report Stevens to law

enforcement or investigate further.  (See id. ¶¶ 53-54, 58; see also Falonk Dep. 126:6-

8).

We cannot conclude that the risk presented by Stevens was "known" to

Western Wayne policymakers at the relevant time.  See Kline, 255 F. App'x at 629-

30 (quoting Black, 875 F.2d at 712-13); M.S., 43 F. Supp. 3d at 421-22; cf. Doe, 880 F.

Supp. at 382-85.  Moreover, given the celerity of the investigation following receipt

of the initial report, the administration could not be said to have been deliberately

indifferent.  See Black, 875 F.2d at 713.  The record at best permits an inference that

Western Wayne could have done more to ascertain the underlying truth.  That a

public entity may have been "negligent in failing to recognize a high risk of harm,"

however, is not a wrong of constitutional dimension.  Kline, 255 F. App'x at 628-29

(citing Black, 985 F.2d at 712-13).  No reasonable juror could conclude that Western

Wayne was deliberately indifferent to a known risk of harm to current or future

students.  Consequently, we will grant summary judgment to Western Wayne

School District with respect to Count 6 of Kobrick's complaint.

### c.   **Lakeland School District**

Against the Lakeland School District, Kobrick asserts three variations of

<u>Monell</u> liability: *first*, that the district failed to act appropriately upon learning that

Stevens might have been abusing Kobrick; *second*, that the district failed to train

staff to identify signs of "grooming" behavior and to report it; and *third*, that the

district was negligent in hiring Stevens in the first instance.[12]  (<u>See</u> Doc. 130 at 7-23).

### i.   **Failure to Act**

Kobrick's failure-to-act claim against Lakeland School District is premised

on the district's alleged failure to respond to both known grooming activities and

known sexual abuse.  (<u>See</u> <u>id.</u>)  To prevail on this claim, Kobrick must establish a

practice of "reckless indifference to instances of known or suspected sexual abuse

of students by teachers." <u>Stoneking</u>, 882 F.2d at 724-25.  Courts require proof that

school administrators were placed on actual notice of the abusive contact before

imposing constitutional liability for teacher misconduct to the district.  <u>See</u> <u>Kline</u>,

255 F. App'x at 629-30; <u>M.S.</u>, 43 F. Supp. 3d at 421-22; <u>C.M.</u>, 828 F. Supp. at 1185.

The mere failure to recognize a risk of harm will not suffice.  <u>See</u> <u>Kline</u>, 255 F.

App'x at 628-29 (quoting <u>Black</u>, 985 F.2d at 712-13).

Kobrick first asserts that Kameroski and Billings-Jones "knew" Stevens was

engaged in grooming activities with students.  (<u>See</u> Doc. 130 at 8, 10-11).  Kobrick

---

[12] Kobrick does not respond to the Lakeland School District's municipal liability arguments in her opposition brief.  (<u>See</u> Doc. 130 at 7-23).  Nonetheless, because Kobrick does respond to similar arguments raised by Billings-Jones and Kameroski, (<u>see</u> <u>id.</u>; <u>see also</u> Doc. 132 at 5-24), we decline to exercise our discretion to deem the claims waived.  <u>See</u> <u>D'Angio v. Borough of Nescopeck</u>, 34 F. Supp. 2d 256, 265 (M.D. Pa. 1999).

cites no record evidence to support this assertion.  (See id.)  What the record does show is that Billings-Jones and Kameroski knew Kobrick spent much of her time in the band room, but suspected nothing inappropriate given Kobrick's music-focused curriculum and career plans.  (See Doc. 103 ¶¶ 18-19, 95; Doc. 106 ¶¶ 37-39, 95).  Kameroski and Billings-Jones deny knowledge of any sexual or other inappropriate contact between Stevens and Kobrick.  (Doc. 103 ¶ 57; Doc. 106 ¶¶ 133-35).  Kobrick adduces no contradictory evidence.  Courts routinely hold that, without more, the mere fact of a teacher spending time with a student is not enough to raise the specter of potential sexual abuse.  See Kline, 255 F. App'x at 628-29; M.S., 43 F. Supp. 3d at 421-22; Douglas, 836 F. Supp. 2d at 361-63.

Kobrick also contends that at least one administrator, Kameroski, was actually aware of the sexual relationship that developed between Kobrick and Stevens.  (Doc. 130 at 8).  Kobrick testified that Kameroski "walked in one time" when she had her "arms wrapped around [Stevens'] waist."  (Kobrick Dep. 259:18-262:2).  Kobrick further testified that as soon as Kameroski entered the room, she "immediately" dropped her arms.  (Id. at 264:1-23).  When questioned by counsel whether she thought Kameroski witnessed the embrace, Kobrick answered "Yes." (Id. at 263:17-25, 264:24-265:5).  Kobrick maintains that this incident sufficiently placed the school on notice of sexual misconduct—or at least of "grooming" activities which might lead to sexual misconduct.  (Doc. 130 at 8).

We assume the truth of Kobrick's account for purposes of Lakeland's Rule 56 motion.  We also assume without deciding that Kameroski was a district policymaker for purposes of Monell liability.  Even so, the incident at worst evinces

negligence on Kameroski's part for failing to investigate further. Kobrick testified that she withdrew from the contact "immediately" upon seeing Kameroski, and that Stevens explained the incident away by telling Kameroski that Kobrick had been "reaching for [Stevens'] keys." (Kobrick Dep. 264:1-23, 265:15-266:21). Kobrick did not describe the embrace allegedly observed by Kameroski as sexual or otherwise inappropriate in nature. (Id. at 259:18-262:2). For his part, Kameroski testified that he was aware that students spent considerable time in the band room but that he never once had reason to suspect sexual abuse. (See Doc. 103 ¶¶ 18-19).

We agree that a diligent principal likely would have investigated the incident. However, as noted *supra*, negligent failure to discover sexual abuse does not suffice for municipal liability. Kline, 255 F. App'x at 628-29 (quoting Black, 985 F.2d at 712-13; Maier *ex rel.* B.T. v. Canon McMillan Sch. Dist., No. 08-0154, 2009 WL 2591098, at *9 (W.D. Pa. 2009) (same). A jury could not find on the basis of this isolated incident that Kameroski was actually aware of a "constitutionally violative sexual relationship" while it was ongoing. See M.S., 43 F. Supp. 3d at 421 (citing Johnson, 283 F.3d at 144); see also Kline, 255 F. App'x at 628-29.

Kobrick also devotes much of her briefing to a claim that Shayka, a fellow teacher, warned Stevens that the latter had "crossed the line from professional to personal because of his observation of [Stevens'] closeness with students." (Doc. 130 at 8). Shayka is not an administrator or policymaker, and his alleged knowledge of grooming activities cannot be imputed to the school district under Monell. See Johnson, 283 F.3d at 144 n.1 (citing Pembaur v. City of Cincinnati, 475 U.S. 469, 483 (1986)). More pertinently, Kobrick takes much of Shayka's testimony out of context

24

and at times misrepresents it.[13]  Shayka did testify that he advised Stevens to "try to keep your boundaries" on one or two occasions.  (Shakya Dep. 18:13-22).  But he did not describe "inappropriate personal closeness" with students.  (Cf. Doc. 129 ¶ 20). Shayka testified only that Stevens was sometimes informal with students in a way that Shayka was not, for example, by trying to be funny or "telling a story that . . . might have some profanity in it."  (Shayka Dep. 16:3-25, 54:8-25).  He flatly denied observing any indicia of a sexual relationship between Stevens and Kobrick or any other student.  (Id. at 54:22-25; Doc. 106 ¶¶ 168-72).  In fact, he testified that he regularly saw Stevens and Kobrick together and never noticed "anything out of the ordinary or anything that would . . . make me suspicious in the least."  (Shakya Dep. 35:18-36:1).  Hence, even if Shayka were a policymaker for Monell purposes, Kobrick has not shown that he was aware of Stevens' misconduct.

The proof *sub judice* falls well short of the actual notice typically sufficient to survive Monell scrutiny.  Kobrick concedes that she did not report the relationship to administrators until more than a year after it occurred.  (Kobrick Dep. 294:24-296:7).  Lakeland's administrators unanimously testified that they were unaware of *any* sexual misconduct by Stevens until Kobrick came forward.  (See Doc. 103 ¶¶ 20, 25, 30, 32, 39-40, 45, 103; Doc. 106 ¶¶ 108-13, 122-24, 133-35, 137, 139, 145, 153, 155, 157, 159, 161, 164, 167, 170-75, 179-81, 184-89, 194, 196).  And Kobrick testified that

---

[13] For example, Kobrick avers that the study hall arrangement "led Mr. Shayka to tell Mr. Stevens that Mr. Stevens had crossed the line from professional to personal."  (Doc. 129 ¶ 19).  Kobrick identifies no record evidence to support this statement.  When Kobrick's counsel asked Shayka whether he had concerns or ever spoke to Stevens "about [Kobrick] going to see him on a regular basis," Shayka answered with an unequivocal "No."  (Shayka Dep. 33:8-11).

she deliberately kept the relationship from family, friends, fellow bandmates, and administrators. (See Kobrick Dep. 269:23-272:8). The record permits no inference that Lakeland School District had an unwritten policy or practice of condoning or covering up known sexual abuse.

### ii. Failure to Train

Kobrick claims that Lakeland failed to train staff to identify and to report inappropriate teacher-student sexual relationships.[14] (Doc. 130 at 16-21). She contends that staff should have been trained to detect signs of "grooming" in teacher-student relationships and that the lack of this training is one cause of her constitutional injury. (See id.)

To prevail on a failure-to-train claim, a plaintiff must identify a training deficiency which has a "causal nexus" to their injuries and demonstrate that the lack of training reflects deliberate indifference to constitutional rights. See M.S., 43 F. Supp. 3d at 424 (quoting Reitz v. Cty. of Bucks, 124 F.3d 139, 145 (3d Cir. 1997)). Knowledge of a need for training is critical to a deliberate indifference finding. See Connick, 563 U.S. at 61 (citing Bryan Cty., 520 U.S. at 407). To show knowledge, a plaintiff generally must establish "a pattern of similar constitutional violations" committed in the past by untrained employees. Douglas, 836 F. Supp. 2d at 357 (quoting Connick, 563 U.S. at 62). However, the Supreme Court has also held that

---

[14] As a threshold matter, it is not clear whether a cause of action exists for failure to train employees *other than* the employee effecting the constitutional violation. See Douglas, 836 F. Supp. 2d at 364-65 (quoting Connick, 563 U.S. at 61); but see Kline, 255 F. App'x at 629-30. We need not address this difficult question, because Kobrick fails to substantiate a failure-to-train claim either way. See, e.g., Douglas, 836 F. Supp. 2d at 364-65.

there exists a "narrow range of circumstances" in which a single violation may permit failure-to-train liability. <u>M.S.</u>, 43 F. Supp. 3d at 424-25 (quoting <u>Bryan Cty.</u>, 520 U.S. at 409). This theory of liability requires proof that the need for training was "so obvious" in view of a given employee's duties that failure to train necessarily amounts to deliberate indifference. <u>Id.</u> (quoting <u>City of Canton</u>, 489 U.S. at 390). That a constitutional injury may have been avoided by better training, however, does not suffice for <u>Monell</u> liability. <u>See</u> <u>Kline</u>, 255 F. App'x at 629 (citing <u>City of Canton</u>, 489 U.S. at 391).

Kobrick's failure-to-train claim does not survive Rule 56 scrutiny. At the motion to dismiss stage, the court allowed this claim to proceed based on Kobrick's allegation that Lakeland "knew about the inappropriate relationship . . . and failed to act." <u>Kobrick</u>, 2014 WL 4914186, at *17. But the Rule 56 record reveals a fatal variance between the *allegata* and the *probata*. There is no genuine dispute that Lakeland administrators were entirely unaware of the misconduct perpetrated by Stevens. <u>See</u> *supra* at 22-26. Kobrick has adduced *no* evidence that a "pattern of similar constitutional violations" put Lakeland on notice of a need to train other teachers to identify signs of sexual misconduct. <u>See</u> <u>Kline</u>, 255 F. App'x at 630; <u>M.S.</u>, 43 F. Supp. 3d at 424.

Absent proof of a pattern of past violations, Kobrick can only proceed on a "single incident" theory. Kobrick does not invoke this theory, (<u>see</u> Doc. 130 at 16-21), and the record does not support it. In <u>Kline</u>, the Third Circuit held in no uncertain terms that single incident liability cannot lie in such cases. <u>See</u> <u>Kline</u>, 255 F. App'x at 630. Specifically, <u>Kline</u> states that sexual abuse of students is so

obviously inappropriate that failure to train employees to detect signs of sexual misconduct cannot be said to be deliberately indifferent.  Id.; see also M.S., 43 F. Supp. 3d at 425; Jankowski v. Lellock, No. 2:13-CV-194, 2013 WL 5945782, at *9 (W.D. Pa. Nov. 6, 2013).  Hence, Kobrick could not prevail on a single incident theory of liability.

Kobrick relies heavily on the report of her expert, Charol Shakeshaft, Ph.D. ("Dr. Shakeshaft"), in support of her failure-to-train claim.  (Doc. 130 at 15-16; see Doc. 131-7).  In her report, Dr. Shakeshaft opines that all school districts should maintain "clear polices and regulations that describe educator sexual abuse" which "detail acceptable and unacceptable behavior."  (Doc. 131-7 at 18).  She suggests that such policies should expressly enumerate inappropriate behavior, including prohibitions on being alone with a student, and that districts should regularly train staff and students on those policies.  (Id.)  She believes that the lack of such training allowed Stevens' misconduct to continue undetected.  (See id. at 24).  That an injury "could have been avoided" with "better or more training" is not by itself sufficient for municipal liability.  See City of Canton, 489 U.S. at 391; Kline, 255 F. App'x at 630.  Regardless of Dr. Shakeshaft's opinions—or the very plausible merit of the training program she proposes—the fact remains Kobrick has not established that Lakeland knew of and was deliberately indifferent to an actual risk of harm.

Shakeshaft further suggests that Lakeland failed to properly train staff in the first instance that teacher-student sexual relationships are inappropriate.  (See Doc. 131-7 at 25).  Shakeshaft specifically notes that she observed "no indication . . . that training on the prohibition of sexual misconduct occurred."  (Id.)  Shakeshaft's

report does not expressly address the adequacy of the one-time induction training provided to all new teachers by the NEIU. There is no dispute that this training was provided to Stevens and covers subjects such as teacher-student sexual abuse. (See Doc. 103 ¶¶ 74, 102; Doc. 106 ¶ 263; Doc. 129 ¶¶ 74, 102). Shakeshaft ostensibly believes this state-mandated training to be insufficient. (Doc. 131-7 at 24 (stating that "annual training of all employees [should] be mandated")). Kobrick does not appear to premise her failure-to-train claim on this observation. In any event, as noted *supra*, courts in the Third Circuit regularly hold that the duty to refrain from sexual abuse of students is self-evident. Douglas, 836 F. Supp. 2d at 361 (quoting Connick, 563 U.S. at 66; Stoneking, 882 F.2d at 727); see also Nace v. Pennridge Sch. Dist., 185 F. Supp. 3d 564, 578 (E.D. Pa. 2016) (quoting Kline, 255 F. App'x at 630). Thus, misconduct of the nature committed by Stevens cannot be fairly attributed to a failure to train.

### iii.    Negligent Hiring

Kobrick lastly contends that Lakeland's deficient hiring practices directly caused her constitutional injury. (See Doc. 130 at 11-13, 21-23). Specifically, she contends that Lakeland erred by relying exclusively on a recommendation letter from Stevens' former supervisor at Western Wayne and should have contacted Western Wayne's administration for a reference. (Id.) Kobrick does not identify a pattern of deficient hiring practices and ostensibly proceeds on a single incident theory. (See id.)

Failure to adequately screen employees will ordinarily support Monell liability only when the failure causes a pattern of violations. See Berg, 219 F.3d at

276 (quoting Bryan Cty., 520 U.S. at 404).  In its only opinion on the subject, the Supreme Court "assume[d] without deciding that proof of a single instance of inadequate screening could ever trigger municipal liability." Bryan Cty., 520 U.S. at 412.  The Court explained that in a negligent hiring case, the evidence must exceed a "mere probability" that a poorly-screened candidate may inflict *some* constitutional harm; rather, the plaintiff must establish that "*this* officer was highly likely to inflict the *particular* injury suffered." Id.  An undisclosed incident in a candidate's record must be "basically *identical* to the harm eventually caused." M.S., 43 F. Supp. 3d at 426-27 (citation omitted).  In addition to this causal connection, a plaintiff must show that the hiring decision flowed from deliberate indifference to the risk that constitutional harm will follow. Id. (citing Bryan Cty., 520 U.S. at 410).

There is no genuine dispute that the injury caused by Stevens in the past— sexual misconduct with a minor student—is identical to the injury inflicted upon Kobrick.  But our analysis cannot end there.  The proper inquiry is whether the decision to hire Stevens manifests deliberate indifference to Kobrick's right to bodily integrity. See Bryan Cty., 520 U.S. at 414-15.  Hence, we consider not whether better practices would have avoided the injury, but instead whether Lakeland's hiring practices as implemented reflect deliberate indifference to a "highly predictable" risk of that injury in the first instance. See id. at 409.

No reasonable jury could conclude that Lakeland was deliberately indifferent to a risk of harm to its students.  Administrators reviewed Stevens' application in full before deciding to invite him to interview.  (See Doc. 103 ¶ 2; Doc. 129 ¶ 2).  The

application identified four references, including Stedenfeld, the band director who directly supervised Stevens at Western Wayne. (Doc. 103 ¶ 2; Doc. 129 ¶ 2). The application contained three favorable letters of recommendation, one of which was authored by Stedenfeld. (Doc. 103 ¶ 2; Doc. 129 ¶ 2). A background check revealed that Stevens had no criminal record, and a child abuse history clearance reported no known record of child abuse. (Doc. 103-3 at 104-05). Stevens was also strongly recommended by a member of Lakeland's school board. (Doc. 103 ¶ 5; Doc. 129 ¶ 5).

With this extensive background in hand, failure to also contact Western Wayne administrators could not be deemed deliberate indifference. As we have observed *passim*, mere negligence does not equate to indifference of a constitutional dimension. See <u>M.S.</u>, 43 F. Supp. 3d at 427 (citations omitted). Lakeland had in its possession a "strong letter of reference" from Stevens' direct supervisor at Western Wayne, together with a criminal background check and clearance revealing no past instances of sexual abuse. (<u>See</u> Doc. 103 ¶¶ 2-3; Doc. 129 ¶¶ 2-3; Doc. 106 ¶ 215; Doc. 103-3 at 104-05). The lack of additional inquiry under such circumstances cannot constitute deliberate indifference to students' constitutional rights.

Even if Lakeland had conducted a more thorough investigation, Western Wayne could *at most* have reported that a "rumor" of an inappropriate relationship existed, was fully investigated, and was deemed unfounded. (<u>See</u> Sheehan Dep. 181:4-11). This information may have been a red flag and certainly may have impacted the decision of Lakeland's board to hire Stevens. But it does not, on its own, support a conclusion by Lakeland's administration that the "plainly obvious

consequence" of hiring Stevens would be sexual abuse of a minor student.  See Bryan Cty., 520 U.S. at 411.

A school district is responsible for its "*own* illegal acts."  Pembaur, 475 U.S. at 479.  The undisputed record evidence belies any finding that the district committed a constitutional wrong.  It was Stevens' wrongdoing—not wrongdoing on Lakeland's part—that led to the alleged violation of Kobrick's substantive due process rights.  The court will grant summary judgment to Lakeland on Kobrick's failure-to-act, failure-to-train, and negligent hiring claims.

### 2. *Supervisory Liability Against Billings-Jones, Kameroski, Falonk, and Sheehan*[15]

The supervisory defendants each raise a parallel defense, maintaining that they did not know of the threat posed by Stevens and could not have been deliberately indifferent to that threat.  (Doc. 104 at 20-25, 32-33; Doc. 112 at 8-9; Doc. 113 at 8-10).  Each defendant accordingly invokes the protective shield of qualified immunity.  (See Doc. 104 at 49-51; Doc. 112 at 4-9; Doc. 113 at 10-13).  The court will address Kobrick's claims against the supervisory defendants through the prism of the qualified immunity doctrine.

---

[15] It is unclear whether Kobrick attempts to pursue official capacity claims against defendants Billings-Jones, Kameroski, Falonk, and Sheehan.  However, it is settled law that a suit against a government employee in his or her official capacity is synonymous with a claim against the public entity that employs him or her.  See Kentucky v. Graham, 473 U.S. 159, 165 (1985) (citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)).  Redundant official-capacity claims warrant dismissal.  Snell v. City of York, 564 F.3d 659, 120 (3d Cir. 2009).  Kobrick asserts claims against both the individual defendants and the school districts that employ them.  Thus, to the extent Kobrick asserts official capacity claims against an individual defendant, the claims will be dismissed as duplicative.

Qualified immunity protects a state actor who has committed a constitutional violation if the plaintiff's rights were not "clearly established" when the individual acted. Pearson v. Callahan, 555 U.S. 223, 244-45 (2009). No liability will attach if a reasonable actor could have believed the challenged conduct was in compliance with settled law. Id.; see also Springer v. Henry, 435 F.3d 268, 280 (3d Cir. 2006). The doctrine cloaks government officials with "immunity from suit rather than a mere defense to liability," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985) (emphasis omitted), and "ensure[s] that insubstantial claims against government officials [will] be resolved prior to discovery." Pearson, 555 U.S. at 231-32 (quoting Anderson v. Creighton, 483 U.S. 635, 640 n.2 (1987)). The defense generally "protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 563 U.S. 731, 743 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)). The burden to establish qualified immunity rests with the defendant claiming its protection. Beers-Capitol v. Whetzel, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

A court evaluating a claim of qualified immunity considers two distinct inquiries: whether, based on the record evidence, a constitutional right has been violated and, if so, whether the right was "clearly established" at the time of the alleged violation. Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 (3d Cir. 2015) (quoting Pearson, 555 U.S. at 232). A court may begin its qualified immunity analysis with either prong. See Pearson, 555 U.S. at 237. Nearly three decades ago, the Third Circuit affirmed that a student's right to be free from sexual abuse at the hands of her teacher is clearly established. See Stoneking, 882 F.2d at 727. Hence,

we assess whether any supervisory defendant violated Kobrick's clearly established right.

Like municipalities, a supervisory defendant in a Section 1983 action may not be held liable merely on a theory of *respondeat superior*. See M.S., 43 F. Supp. 3d at 428 (quoting Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988)). Supervisory liability attaches in one of two ways: (1) the supervisor, "with deliberate indifference to the consequences," establishes and maintains a policy, practice, or custom that directly causes the alleged constitutional violation, or (2) the supervisor participates in or directs the alleged constitutional violation, or has knowledge of and acquiesces in the unconstitutional action of a subordinate. Barkes v. First Corr. Med., Inc., 766 F.3d 307, 316 (3d Cir. 2014), rev'd on other grounds by Taylor v. Barkes, 135 S. Ct. 2042 (2015). Knowledge of the constitutional violation, or substantial risk of such violation, is a requisite component of either theory. M.S., 43 F. Supp. 3d at 428 & n.7 (citations omitted). In the context of teacher-student sexual misconduct, the Third Circuit in Stoneking drew a line between failure to act or investigate, which does not invite liability, and "affirmative acts" conveying "toleration, condonation, or encouragement" of sexual abuse, which does. Stoneking, 882 F.2d at 731.

We conclude that Kobrick's claims against the individual defendants fail for the same reasons as the Monell claims against their respective employers. See M.S., 43 F. Supp. 3d at 428 (quoting Carter v. City of Phila., 181 F.3d 339, 356 (3d Cir. 1999)). Kobrick's position with respect to Sheehan and Falonk is virtually identical to her Monell claim against Western Wayne: suggesting that they should have done more to ascertain the truth of the rumor about Stevens. (Doc. 141 at 25-26). The

record, however, establishes that Sheehan and Falonk fully investigated the claim of an "inappropriate relationship" and believed both the student and her father that nothing untoward had occurred.  (See Doc. 108 ¶¶ 24-30, 32, 34-35, 40, 43-48, 50, 58, 65-66, 68-70, 72-78, 86; see also Falonk Dep. 126:6-8).  There is no basis on this record for a jury to conclude that Sheehan and Falonk had actual knowledge of an ongoing sexual relationship between Stevens and a student or that they were deliberately indifferent to that knowledge.  Accordingly, because neither defendant deprived Kobrick of her constitutional rights, both Sheehan and Falonk are entitled to qualified immunity.

The record is likewise devoid of evidence that Billings-Jones and Kameroski knew of ongoing sexual misconduct by Stevens.  Kobrick claims broadly that both individuals "knew of behavior that would suggest sexual assault."  (Doc. 132 at 9).  She cites no evidence to support this proposition.  There is a dearth of proof from which a reasonable jury could find or infer that either Billings-Jones or Kameroski was actually aware of the sexual misconduct while it was ongoing or had observed indicia of sexual abuse.  See supra at 22-26; see also M.S., 43 F. Supp. 3d at 421.  The only evidence on this point is testimony of Billings-Jones and Kameroski, each of whom categorically denies any contemporaneous awareness of an inappropriate relationship between Stevens and Kobrick.  Kobrick also attempts to impute knowledge of the relationship based on the administrators' alleged knowledge of "grooming" behaviors, specifically, their general awareness that Stevens and Kobrick spent considerable time together, in addition to Kameroski's alleged knowledge of Kobrick embracing Stevens.  (See Doc. 130 at 8-11, 15-16; Doc. 132 at

9-12). We have already concluded that this evidence does not establish actual knowledge of sexual misconduct. <u>See</u> *supra* at 22-26; <u>see also</u> <u>Kline</u>, 255 F. App'x at 628-29; <u>M.S.</u>, 43 F. Supp. 3d at 421-22; <u>Douglas</u>, 836 F. Supp. 2d at 361-63.

Kobrick asserts, *in essentia*, that Billings-Jones or Kameroski could have (and should have) done more to forestall Stevens' abuse. This is not the standard for Section 1983 liability. It is not enough for Kobrick to aver that either defendant "could have averted her injury and failed to do so." <u>Black</u>, 985 F.2d at 712. Kobrick must show that each defendant played an "affirmative role in bringing about the sexual abuse." <u>Id.</u> (quoting <u>Colburn</u>, 946 F.2d at 1025); <u>Douglas</u>, 836 F. Supp. 2d at 354-55. Neither Billings-Jones nor Kameroski engaged in *any* affirmative act which suggested that sexual abuse was tolerated, condoned, or encouraged at Lakeland. <u>See</u> <u>Stoneking</u>, 882 F.2d at 731.

Nor could it be said that either defendant was deliberately indifferent to Kobrick's constitutional rights. Billings-Jones sprang into action immediately when Kobrick's mother reported the relationship, contacting the district attorney and Kameroski as well as the district's special counsel and solicitor. (Doc. 103 ¶¶ 55-56; Doc. 106 ¶¶ 59-60, 72-74; Doc. 129 ¶¶ 55-56; <u>see</u> Doc. 131 ¶¶ 59-60, 72-74). Billings-Jones had Kameroski escort Stevens from school property, reported the allegation to the Department of Education, and terminated his employment. (<u>See</u> Doc. 103 ¶¶ 56-57; Doc. 106 ¶¶ 69-70, 83-88). The administrators cooperated fully with law enforcement's investigation. (<u>See</u> Doc. 106 ¶¶ 63, 73-75, 77, 79). That Billings-Jones and Kameroski acted as professional administrators upon learning of Stevens' misconduct is beyond peradventure. Kobrick has not established that either

defendant violated her constitutional rights. Accordingly, Billings-Jones and Kameroski are entitled to qualified immunity. The court will grant summary judgment to the supervisory defendants.[16]

**B.     Title IX**

Kobrick asserts claims against both school districts under Title IX. Title IX proscribes discrimination, exclusion, or denial of benefits on the basis of sex in educational institutions or programs which receive federal funding. See 20 U.S.C. § 1681. The Supreme Court has recognized an implied private right of action thereunder, see Cannon v. Univ. of Chi., 441 U.S. 677 (1979), as well as a monetary damage remedy in such private actions. See Franklin v. Gwinnett Cty. Pub. Sch., 503 U.S. 60, 75-76 (1992). To succeed on a Title IX sexual harassment claim, a plaintiff student must show: (1) *quid pro quo* sexual harassment, or a sexually hostile educational environment; (2) actual notice to an "appropriate person" who has the authority to institute corrective measures; and (3) a response to the harassment that amounts to deliberate indifference. Bennett v. Pa. Hosp. Sch. of Nurse Anesthesia, No. 01-CV-4098, 2002 WL 32341792, at *3 (E.D. Pa. Oct. 29, 2002) (citing Gebser v. Lago Vista Indep. Sch. Dist., 524 U.S. 274, 291-92 (1998)); see Bostic v. Smyrna Sch. Dist., 418 F.3d 355, 359 (3d Cir. 2005).

---

[16] To the extent Kobrick's claims against the individual Lakeland defendants are premised on the alleged negligent hiring of Stevens, those claims are meritless. The *allegata* against Billings-Jones concerning negligent hiring is identical to that asserted against Lakeland itself; the individual claim against Billings-Jones thus falls with the Monell claim. As for Kameroski, the record establishes that he was not involved in the hiring process. (Doc. 103 ¶ 92; Doc. 106 ¶¶ 8, 23, 30).

Under Title IX, an appropriate person "is, at a minimum, an official of the recipient entity with authority to take corrective action to end the discrimination." Gebser, 524 U.S. at 290. A school principal and superintendent will ordinarily be appropriate persons for purposes of Title IX. See Warren *ex rel.* Good v. Reading Sch. Dist., 278 F.3d 163, 171 (3d Cir. 2002). Like Section 1983 cases, liability under Title IX turns on actual knowledge of the misconduct and the failure to respond. See Bostic, 418 F.3d at 362; Warren, 278 F.3d at 173-74. Knowledge requires more than mere awareness of a risk of harm, but less than "absolute certainty" that it has occurred. Dawn L. v. Greater Johnstown Sch. Dist., 586 F. Supp. 2d 332, 367 (W.D. Pa. 2008) (citing Bostic, 418 F.3d at 360). Actual knowledge exists if the school was aware of facts that indicated "sufficiently substantial danger to students." Bostic, 418 F.3d at 361 (citation omitted).

A Title IX plaintiff must also establish deliberate indifference on the part of persons with knowledge of the harassment. An official decision not to remedy any type of discrimination demonstrates deliberate indifference. See Bostic, 418 F.3d at 360. A clearly unreasonable response to actual notice of harassment also amounts to deliberate indifference. Chancellor v. Pottsgrove Sch. Dist., 501 F. Supp. 2d 695, 708 (E.D. Pa. 2007).

Kobrick's Title IX theory of liability mirrors her constitutional charges. Consequently, her Title IX claims necessarily fail for the same reasons as her Monell claims. For liability to attach under Title IX based on a sexual relationship between teacher and student, Kobrick must show, *inter alia*, that an "appropriate person" had "*actual notice* of the relationship itself." Douglas, 836 F. Supp. 2d at

346-47 (emphasis added) (internal quotation marks omitted) (citing <u>Bostic</u>, 418 F.3d at 360-61).  Suggesting that an administrator should have known or had reason to suspect is not enough.  <u>Id.</u>  Despite the benefit of every favorable Rule 56 inference, Kobrick has not shown that any person at either district *actually knew* of Stevens' misconduct.  Nor could a reasonable juror conclude that either district acted with deliberate indifference to that misconduct when it eventually became known.  The court will grant summary judgment to Lakeland and Western Wayne on Kobrick's Title IX claim.

### C.      Intentional Infliction of Emotional Distress

Kobrick also seeks to hold Sheehan and Kameroski liable under state law for intentional infliction of emotional distress.  A claim for intentional infliction of emotional distress requires proof that: (1) the defendant's conduct was extreme and outrageous; (2) the conduct caused the plaintiff severe emotional distress; and (3) the defendant acted intending to cause such distress or with knowledge that same was "substantially certain" to occur.  <u>Brown v. Muhlenberg Twp.</u>, 269 F.3d 205, 217-18 (3d Cir. 2001) (quoting RESTATEMENT (SECOND) OF TORTS § 46, cmt. d (AM. LAW. INST. 1965)).  The Pennsylvania Supreme Court has not yet explicitly recognized the tort of intentional infliction of emotional distress.  <u>Taylor v. Albert Einstein Med. Ctr.</u>, 754 A.2d 650, 652 (Pa. 2000).  The Third Circuit has predicted that the state's high court will ultimately adopt the Restatement (Second) of Torts' formulation.  <u>Williams v. Guzzardi</u>, 875 F.2d 46, 50 (3d Cir. 1989); <u>Chancellor</u>, 501 F. Supp. 2d at 710 (citing <u>Williams</u>, 875 F.2d at 50).

Whether conduct could reasonably be regarded as extreme and outrageous is a threshold inquiry for the court's determination. See M.S., 43 F. Supp. 3d at 430 (citing Rein v. Tien, 514 A.2d 566, 569 (Pa. Super. Ct. 1986). As a general rule, mere negligence or passivity will not support an intentional infliction of emotional distress claim. Id. at 431 (quoting Thompson v. AT&T Corp., 371 F. Supp. 2d 661, 684 (W.D. Pa. 2005); Kazatsky v. King David Mem'l Park, Inc., 527 A.2d 988, 991 (Pa. 1987)).

Defendants' answer to this claim is threefold: *first*, that Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA"), 42 PA. STAT. AND CONS. STAT. ANN. § 8541 *et seq.*, immunizes them from liability; *second*, that defendants' conduct was neither extreme nor outrageous; and *third*, that Kobrick has not proven that she suffers from severe emotional distress. (See Doc. 104 at 44-48; Doc. 113 at 18-20). Kobrick offers a familiar rejoinder: that both defendants "knew" that Stevens was sexually abusing a minor and failed to intervene. (See Doc. 130 at 27-29; Doc. 141 at 33-34).

We agree that both defendants are entitled to governmental immunity. The PSTCA shields local agencies from tort liability to the extent that conduct does not fall within specific statutory exceptions to immunity. See 42 PA. STAT. AND CONS. STAT. ANN. § 8541 *et seq.* This immunity extends to employees of local agencies for actions taken "within the scope of [the employee's] office or duties." Id. § 8545. The Act exempts from its protective scope any employee whose injurious act constitutes a "crime, actual fraud, actual malice[,] or willful misconduct." Id. § 8550.

Kobrick invokes the willful misconduct exception. To strip an employee of governmental immunity, courts generally require proof that the employee "desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." Bright v. Westmoreland Cty., 443 F.3d 276, 287 (3d Cir. 2006) (quoting Robbins v. Cumberland Cty. Children & Youth Servs., 802 A.2d 1239, 1252-53 (Pa. 2002)). The willful misconduct exception requires something more than deliberate indifference on the part of agency actors. M.S., 43 F. Supp. 3d at 433 (citing Owens v. City of Phila., 6 F. Supp. 2d 373, 395 (E.D. Pa. 1998)).

Our finding *supra* that neither Sheehan nor Kameroski was deliberately indifferent to a risk of harm to Kobrick *ipso facto* defeats her willful misconduct assertion. Assuming *arguendo* that governmental immunity does not apply, Kobrick's claim nonetheless fails on its merits. No record evidence suggests that Sheehan or Kameroski acted with intent to cause distress or with knowledge that distress was "substantially certain" to occur.[17] See Brown, 269 F.3d at 217-18.

Nor has Kobrick proven the requisite degree of emotional distress to substantiate her claim. Under Pennsylvania law, a plaintiff must prove that she suffered physical symptoms as a result of the emotional distress, see M.S., 43 F. Supp. 3d at 430-31 (quoting Reeves v. Middletown Athletic Ass'n, 866 A.2d 1115,

_____

[17] Kobrick suggests in her opposition brief that Sheehan affirmatively acted to cover up the rumor by directing Stedenfeld, the band director at Western Wayne, not to tell anyone about Stevens' misconduct. (Doc. 41 at 34). Relevant testimony reflects only that Sheehan asked Stedenfeld "not to speak to [Stevens] or anyone else about this issue *at that point*." (Sheehan Dep. 140:19-141:16 (emphasis added)). The intimation that Sheehan attempted to conceal the allegation against Stevens in some permanent fashion is a misrepresentation of Sheehan's testimony.

1122 (Pa. Super. Ct. 2004); <u>Kazatsky</u>, 527 A.2d at 995), and both the physical and emotional aspect of her injury must be substantiated by expert medical evidence. <u>See</u> <u>Bougher v. Univ. of Pittsburgh</u>, 882 F.2d 74, 80 (3d Cir. 1989) (citing <u>Williams</u>, 875 F.2d at 52; <u>Kazatsky</u>, 527 A.2d at 995). Kobrick has not supplied the court with medical records substantiating her symptoms, diagnoses, or treatment. (<u>See</u> Docs. 129, 130, 140, 141). In her brief opposing Lakeland's motion, Kobrick indicates that she suffers from "depression and anxiety," citing to records from a family physician, Bria Tinsley. (Doc. 130 at 28). She notes that, for privacy reasons, "these records will be mailed to the court for filing under seal." (<u>Id.</u> at 28 n.1). The records were never produced to the court. Even if we assume that the records support Kobrick's proposition—that she suffers "emotional distress of depression and anxiety"—she nonetheless fails to establish that her condition is severe, attributable to either principal's conduct, or accompanied by physical symptoms. <u>See</u> <u>M.S.</u>, 43 F. Supp. 3d at 430-31 (quoting <u>Reeves</u>, 866 A.2d at 1122; <u>Kazatsky</u>, 527 A.2d at 995). For all of these reasons, we will grant summary judgment to Sheehan and Kameroski on Kobrick's intentional infliction of emotional distress claim.

## IV.  Conclusion

There is no dispute that Stevens' conduct was deliberate and reprehensible. Stevens' conduct, however, is simply not attributable to Western Wayne, Lakeland, or their respective administrators.  For all of the reasons articulated herein, the court will grant the motions (Docs. 102, 105, 107) for summary judgment filed by the Lakeland defendants, the Western Wayne defendants, and Billings-Jones.  An appropriate order shall issue.

/S/ CHRISTOPHER C. CONNER
Christopher C. Conner, Chief Judge
United States District Court
Middle District of Pennsylvania

Dated:      September 1, 2017